# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| KENNETH WASHINGTON, ) | |
| ) | |
| Plaintiff, ) | Civil Action No._____ |
| ) | |
| v. ) | |
| ) | **COMPLAINT** |
| DEPARTMENT OF THE NAVY, ) | |
| ) | |
| Defendant. ) | |

**COUNTS I, II, III**

### PETITION FOR WRONGFUL DEATH

**COMES NOW** Plaintiff, Kenneth Washington ("Plaintiff"), by and through their undersigned counsel, Christopher E. Sawin, and hereby state the following in support of their Petition for Wrongful Death against the above-named Defendant, Department of the Navy ("Defendant"):

**COUNT IV**

### PETITION FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

**COMES NOW** Plaintiff, Kenneth Washington, by and through their undersigned counsel, Christopher E. Sawin, and hereby state the following in support of their Petition for Wrongful Death against the above-named Defendant:

## INTRODUCTION

This is a civil action filed pursuant to Chapter 28A of the General Statutes of North Carolina, which is commonly referred to as the State of North Carolina's Wrongful Death Statute. N.C. Gen. Stat. §§ 28-18-12. Plaintiff is the surviving biological father of the decedent, Washington ("Decedent").

## PARTIES

1. Plaintiff resides in Kokomo, IN.

2. Plaintiff is the biological father of the decedent.

3. Defendant is a government agency with a principal place of business in North Carolina.

## JURISDICTION & VENUE

4. This Court has original jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1346(b) because the matter in controversy falls under the laws of the United States, specifically the Federal Tort Claims Act ("FTCA").

5. Venue is proper under 28 U.S.C. § 1391 because all acts or omissions complained of occurred in Camp Lejeune, NC, within the boundaries of this court.

## FACTS

6. The Plaintiff was the biological father of the decedent, Washington, born February 3, 1982 at 5:43PM.

7. That Rhonda Renee Bell is the biological mother of decedent and is joined in this proceeding to answer as her interests may appear.

8. Plaintiff is an individual who served in the United States Marine Corps from November 1978 to January 1984.

9. Plaintiff was stationed in Camp Lejeune from 1979 to 1981 and again from 1983 to 1984.

10. Plaintiff and his wife consumed drinking water on Camp Lejeune during the times Plaintiff was stationed there.

11. In September of 1980 and March of 1981, the Plaintiff's wife had two spontaneous abortions, also known as miscarriages.

12. At 5:43PM on February 3, 1982 the Plaintiff's son was born at Pitt County Memorial Hospital. His son lived for 32 minutes and was pronounced deceased at 6:15PM.

13. The cause of death was listed at prematurity due to severe preeclampsia.

14. The Plaintiff's family has no known history of birth defects.

15. On May 20, 2010, upon learning of the cause of his injuries, the Plaintiff filed a Standard Form 95 to the Department of the Navy.

16. This form was marked received by the Navy in May 26, 2010.

17. In the Standard Form 95, the Plaintiff alleged that while stationed at Camp Lejeune, NC himself and his family were exposed to contaminated drinking water that contained Trichlorethylene (TCE) and Tetrachloroethylene (PCE).

18. In the Standard Form 95, the Plaintiff filled out the "Amount of Claim" in section 12c "Wrongful Death" and listed One Hundred Million Dollars ($100,000,000).

19. On January 24, 2019, the Plaintiff received a letter from the Department of the Navy (JAG Office) informing him that his claim was considered under the FTCA and that it did not meet the requirements for compensation.

20. The Plaintiff is now free to file suit in the appropriate U.S. District Court.

21. This Complaint is timely filed under the FTCA, where a claim accrues when the claimant is, "in possession of the critical facts that he has been hurt and who has inflicted the injury." *See Jones v. United States of America*, 691 F.Supp.2d 639 (2010).

22. The FTCA Statute of Limitations are considered tolled as long as the claim is pending. Therefore, the Plaintiff is still within the Statue of Limitations. *See Kwai Fun Wong v. Beebe*, 732 F.3d 1030 (9th Cir. 2013).

23. This claim meets the first prerequisite of the FTCA because the Plaintiff exhausted the administrative remedies created by the Act by filing an administrative claim in writing with the appropriate Federal agency (Department of the Navy) that stated a sum certain of damages and identified the conduct involved.

24. Warnings of Camp Lejeune's drinking water contamination first surfaced in 1980.

25. The laboratory of the U.S. Army Environmental Hygiene Agency, tasked by the United States Navy, collected water samples at Camp Lejeune on October 21, 1980 and ran tests on those samples ten (10) days later.

26. A handwritten surveillance report from the U.S. Army Environmental Hygiene Agency report in 1980 noted: WATER IS HIGHLY CONTAMINATED WITH MOLECULAR WEIGHT HALO-GENERATED HYDROCARBONS.

27. The U.S. Army Environmental Hygiene Agency ran follow-up tests in January, February and March of 1981. Both the January and February 1981 surveillance report forms stated: YOU NEED TO ANALYZE FOR CHLORINATED ORGANICS.

28. Each report carried similar warnings about contamination and showed there was strong interference in getting accurate test results due to unidentified chemicals.

29. The Chief of laboratory services again offered warnings on remarks regarding the results of the March 1981 test data: WATER HIGHLY CONTAMINATED WITH OTHER CHLORINATED HYDRO-CARBONS (SOLVENTS!).

30. In 1982, Elizabeth A. Betz, the Supervisory Chemist in the Quality Control Lab at Camp Lejeune wrote a memorandum to one of her colleagues.

31. The memorandum stated that the lab had identified the chemicals that had been interfering with previous test results.

32. In the Tarawa Terrace water treatment plant and system, the interfering chlorinated hydrocarbon was determined to be tetrachoroethylene, otherwise known as perchloroethylene.

33. An analysis of the Hadnot Point water treatment plant and system showed trichloroethylene and low levels of tetrachloroethylene.

34. In July 1984 test data, well #602 in the Hadnot Point Industrial Area had a benzene level of 380 parts per billion (ppb). The current maximum contaminate limit for benzene exposure set by the Environmental Protection Agency (EPA) is 5-ppb.

35. It took Camp Lejeune officials more than four (4) years after first learning of toxic contamination in some of the base's drinking water wells before they took action to shut these wells down.

36. The United States Marine Corps failed to act quickly or forcefully enough in the 1980s to close down water supply wells it knew were contaminated with toxic chemicals that were endangering the health and safety of its Marines and their families at Camp Lejeune.

37. Leadership at the United States Navy and Camp Lejeune failed to follow their own naval potable water regulation BUMED 6240.3B and 6240.3C which date back to 1963.

38. Leadership at the United States Navy and Camp Lejeune failed to follow Base Order 5100.13b.

39. The existence of BUMED 6240.3B and C together with Base Order 5100.13b meant that the United States Marine Corps possessed at least an operational knowledge that organic solvents and other hazardous materials could and did contaminate the groundwater aboard Camp Lejeune.

40. Failure to follow these regulations amounts to gross negligence on behalf of the United States Marine Corps and Department of the Navy.

41. But for the failure of officials at Camp Lejeune and the Department of the Navy to follow regulations, base orders and act on the water contamination information, the Plaintiff would not have suffered his injuries.

42. The Department of the Navy and United States Marine Corps have withheld records necessary to understand the full effects of the contaminated water and have disseminated inaccurate information regarding the water contamination at Camp Lejeune.

43. In June of 1983, North Carolina's environmental engineer, Mr. Elmore, sent a letter to Col. Marshall at Camp Lejeune.

44. This letter requested original copies of the Grainger analytical data sheets.

45. This request was denied by Col. Marshall.

46. In July 2010, the Marine Corps released a pamphlet titled, "Camp Lejeune: Historic Drinking Water, Questions and Answers."

47. In at least three separate places in the short Marine Corps booklet they claim that no studies have shown an "association between an exposure to the contaminated water and health conditions reported by former residents of Camp Lejeune."

48. The Agency for Toxic Substances and Disease Registry (hereinafter "ATSDR") informed the Marine Corps on September 10, 2010, that these statements are incorrect and said the only completed health study at Camp Lejeune which was conducted by the ATSDR did, in fact, find an association between adverse health effects and exposure to PCE on the base.

49. But for this withholding of information and dissemination of inaccurate information, the Plaintiff would have known of the cause of his injuries at an earlier date.

50. The ATSDR has since released several studies on the negative effects of these chemicals on fetuses and the subsequent health problems of children born to mothers living and working on Camp Lejeune.

51. The United States Marine Corps continues to view the past environmental contamination at Camp Lejeune as a public relations battle rather than a public health hazard.

52. As a direct and proximate result of Defendants' gross negligence in causing the death of the Plaintiff's son and two miscarriages, the Plaintiff, as the survivor of his late son, sustained pecuniary loss, mental anguish, emotional pain and suffering, and other damages.

53. To this day, the Plaintiff is still emotionally distraught and is unable to develop a relationship with women due to the fear of losing children.

54. In 2012, Congress passed the Janey Esminger Act.

55. This act created a list of presumptive conditions (list).

56. Miscarriage is a presumptive condition according to the Janey Act.

## CAUSE OF ACTION

57. Based upon the foregoing facts, Plaintiff brings a claim under the FTCA for Wrongful Death.

## PRAYER FOR RELIEF

8
Case 7:19-cv-00112-BO   Document 1   Filed 06/21/19   Page 8 of 10

WHEREFORE, Plaintiff prays that this Court:

a. Enter a Declaratory Judgment that at the commencement of this action Defendant was in violation of Wrongful Death under North Carolina Statute § 28A-18-2;

b. Order Payment of costs of suit;

c. Order payment of Medical bill(s);

d. Order Payment of reasonable attorneys' fees; and

e. Grant such further relief this Court deems just, equitable, and appropriate to include:

   i. sustained pecuniary loss;

   ii. mental anguish;

   iii. emotional pain and suffering; and

   iv. and other damages available by law.


**PLAINTIFF DEMANDS TRIAL BY JURY ON ALL COUNTS**

                        **KENNETH WASHINGTON**,

                        By his Attorney,

Dated: June 21, 2019             /s/ Christopher E. Sawin
                                     Christopher E. Sawin (BBO# 698491)*
                                     Argos Legal Group, P.C.
                                     99 Derby Street, Suite 200
                                     Hingham, MA 02043
                                     781-738-1084
                                     csawin@argoslegalgroup.com

*/s/ Anthony Poulos*
Anthony Poulos**\***
BBO# 698943
Argos Legal Group, P.C.
99 Derby Street, Suite 200
Hingham, MA 02043
Telephone (617) 212-7458
apoulos@argoslegalgroup.com

*/s/Inez de Ondarza Simmons*
Inez de Ondarza Simmons
North Carolina State Bar No. 34303
**DE ONDARZA SIMMONS PLLC**
410 N. Boylan Ave, Suite 135
Raleigh, North Carolina 27603
Telephone: (919) 256-3736
Fax: (919) 277-7120
Email: Inez@DeOndarzaSimmons.com


\*Appearing by special appearance pursuant to Local Rule 83.1(d)

*Counsel For Kenneth Washington*