IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
No. 7:19-cv-00112-BO

| | |
|---|---|
| KENNETH WASHINGTON AS PERSONAL REPRESENTATIVE OF THE ESTATE OF (BABY BOY) WASHINGTON<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant | PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS FOR LACK OF SUBJECT-MATTER JURISDICTION. |

## INTRODUCTION

The Plaintiff opposes Defendant United States' "Motion to Dismiss for Lack of Subject-Matter Jurisdiction" [Dkt. No. 31] (hereafter "Defendant MTD") because the Defendant has failed to show how this Honorable Court does not have subject-matter jurisdiction. There are two issues in which the Defendant has brought forward: (1) Plaintiff has not exhausted his administrative duties and (2) Plaintiff has not alleged claims that are outside of the discretionary function exception to the Federal Tort Claims Act's ("FTCA") waiver of sovereign immunity. Defendant's arguments both fail. First, courts in this circuit have found administrative claims to be considered exhausted so long as the Defendant is on notice and there is a sum certain, both requirements that this Plaintiff has met. Second, Plaintiff's claims are not barred by the discretionary function exception of the Federal Tort Claims Act ("FTCA") because, as held in

*Jones v. U.S.*, where the Defendant was mandated to follow the Bureau of Medicine and Surgery (hereinafter "BUMEDs") and Base Orders, here the Defendant was also mandated to follow BUMEDs and Base Orders of Camp Lejeune. Therefore, Defendant's Motion to Dismiss for Lack of Subject-Matter Jurisdiction should be denied.

## STATEMENT OF RELEVANT FACTS

Kenneth Washington, a Marine Corps Veteran and personal representative of his decedent son's estate, was a resident of Camp Lejeune from 1979-1981 and again from 1983-1984. Pl. Second Amend. Compl. ¶ 11 [Dkt. No. 21]. During the relevant time periods he lived on Camp Lejeune with his wife, Rhonda Bell, and they consumed the base's contaminated drinking water. *Id* at 12. During their time as residents of Camp Lejeune, the married couple became pregnant three (3) separate times. *Id* at 14-15,18. Two (2) of these pregnancies resulted in a miscarriage (5th month of pregnancy) and one (1) of the pregnancies bore a baby boy that survived for only thirty-two (32) minutes at Pitt County Memorial Hospital before succumbing to the deathly effects of the contaminated drinking water on Camp Lejeune that was ingested by both Kenneth Washington and Rhonda Bell. *Id.*[1]

Upon learning of the Camp Lejeune water contamination, Mr. Washington promptly filed his claim as a prerequisite under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671-2680 (FTCA) no later than March 19, 2010. *Id* at 35. On January 24, 2019, the Defendant, in a sweeping denial of all pending Camp Lejeune water contamination cases, denied Mr. Washington's action and he filed suit in this Honorable Court on June 21, 2019. *Id* at 43. On September 30, 2019, Plaintiff filed a, "Motion for Leave to Amend Complaint" along with a

---

[1] Despite the Defendant's obtuseness regarding hydatidiform moles, the baby boy was very much a living being, a possibility anyone who fully read the Defendant's Merck Manual citation would be made aware.

Second Amended Complaint on October 1, 2019. On December 16, 2019, the Plaintiff's Motion was granted. [Dkt. No. 30].

The Defendant has moved to dismiss this action, arguing that the discretionary function exception of the FTCA bars this action as well as claiming that Plaintiff has not exhausted his administrative duties. Def's Mot. to Dismiss [Dkt. No. 31]. However, the Defendant has been denied on a similar motion in this Honorable Court in 2010 regarding the discretionary function exception. *See Jones v. U.S.*, 691 F.Supp.2d. 639, 642 (E.D.N.C. 2010). (denying Defendant's Motion to Dismiss for Discretionary Function Exception, holding that "[t]he alleged contamination was not a matter committed to discretion subject to policy analysis at the time of Plaintiff's residence at Camp Lejeune.").

In possibly the most profound miscarriage of justice in contemporary military history, the Defendant was able to extract cases from this Honorable Court, under the guise of documents and witnesses, and successfully argue a Motion to Dismiss in a Georgia courtroom based on North Carolina and federal law. *See In Re Camp Lejeune* 263 F.Supp.3d 1318 (N.D. Ga. 2016). Currently, the Defendant attempts to revive their previously denied motion to dismiss, citing yet again, the discretionary function exception.

## STANDARD OF REVIEW

The Plaintiff agrees that he bears the burden of proving subject matter jurisdiction and also argues that such burden has been clearly met. The discretionary function exception, "marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals." *See U.S. v. S.A. Empressa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797 at 808 (1984).

For this burden to be met, the Supreme Court has mandated a two-part test to determine whether the exception bars a suit brought under the FTCA. *See United States v. Gaubert*, 499 U.S. 315, 322-23 (1991). First, this Court must determine if the government employee's act in question was discretionary or mandatory. *Id*. at 322. If this Court determines that the government employee's act in question was not discretionary then the analysis can stop there, and the discretionary function exception will not bar a lawsuit. Second, if the act was discretionary, then it must be determined if the employee's discretion was based on consideration of government policy. *Id*. at 323.

In *Berkovitz v. U.S.*, the court held that the, "discretionary function exception will not apply when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow." 486 U.S. 531, 535 (1988).

## ARGUMENT

### I. Plaintiff Has Satisfied His Duties Under the Administrative Claim Requirements of the FTCA.

The Defendant's MTD incorrectly purports that the Plaintiff has not exhausted his administrative duties under the FTCA. Not only has the Plaintiff exhausted his administrative duties, but the Defendant in their MTD requests this Honorable Court to apply blatantly incorrect law.

A claim is "presented" if it provides the Government with adequate notice to conduct a proper investigation into the underlying incident and places a "sum certain" on the claim's value." *See Mack v. U.S.*, 2001 WL 179888 (D. Md. 2001) (citing *Ahmed v. United States*, 30 F.3d 514, 516-17 (4th Cir. 1994). Courts have held, "the FTCA was not intended as a trap for the 'unwary claimant,' and the purpose of 28 U.S.C. 2675(a) is to provide notice to the relevant federal agency of claims, not to put up a barrier of technicalities to defeat their claims." *See Starr*

*v. U.S.* 262 F.Supp.2d 605, 607-08 (D. Md. 2003). Here, in 2010, after learning of the effects of the Camp Lejeune water contamination, the Plaintiff while unrepresented by counsel, filed a wrongful death administrative claim. *See* [Dkt. 26 Ex. 1]. The Plaintiff provided a sum certain in the *Wrongful Death* section of the Standard Form 95 (emphasis added). *Id*. This sum certain was calculated by the Plaintiff on a salary he believed his son would have made playing in the National Football League ("NFL").[2] Plaintiff then submitted this administrative claim and it was marked received by the Navy "May 2010." *See* Pl. Second Amend. Compl. ¶ 37 [Dkt. No. 21]. This administrative claim put the Defendant on notice of the incident, which allowed the Defendant to conduct an "investigation" into the underlying incident, which they did, over the course of nine (9) years before denying the Plaintiff's claim. *See* Def.'s Resp. to Pl.'s Mot. to Am. [Dkt. No. 26-2].

The Defendant argues that Kenneth Washington's (hereinafter "Mr. Washington") "administrative claim did not state that it was being brought on behalf of any other person." *See* Def.'s Mot. to Dismiss at 5. Defendant also purports that, "Here, Kenneth Washington never presented a claim to the Department of the Navy on behalf of Baby Boy Washington." *Id*. at 7. However, this argument fails for two reasons. First, the Navy did have notice that Mr. Washington was filing a wrongful death claim for his children because he noted as such on the administrative claim. *See* Def.'s Mot. to Dismiss, Exh. 1. The first sentence in the "PERSONAL INJURY/WRONGFUL DEATH" section states, "Because of the contaminates in the water I loss (sic) three children ([d]aughter and two sons)." *Id*. Additionally, Section 12 of this form is "AMOUNT OF CLAIM (in dollars)." *Id*. There are then subsections for both "PERSONAL

---

[2] Plaintiff himself played football in high school against players who, subjectively, he believed he was better than. These same players went on to play in the NFL. The Plaintiff hurt his knee in the Marines and was not able to continue his football career upon release from the Marines. Plaintiff believes his son would have played in the NFL. This is where the One Hundred Million Dollars derives.

INJURY" and "WRONGFUL DEATH," 12b. and 12c., respectively. *Id*. Under the "PERSONAL INJURY" section the Plaintiff filled in "0.00" and under the "WRONGFUL DEATH" section the Plaintiff filled in "$100,000,000.00." *Id*. This is clear and unmistakable evidence of the Plaintiff informing the Defendant that this was in fact a wrongful death claim on behalf of his deceased children. Did the Defendant believe Mr. Washington was alive and filing a wrongful death claim for himself? Clearly, the Defendant realized that the claim was on behalf of the children that Mr. Washington alleged died as a result of the contaminated water and any argument to the contrary is either disingenuous or a woeful strategy not based in law. Accordingly, the wrongful death administrative claim was one that Mr. Washington was filing on behalf of his deceased children. Second, and independently, the Defendant incorrectly interprets the law relating to the exhaustion of administrative claims. Whether Mr. Washington's claim gave notice to the Navy that Mr. Washington was presenting a claim *on behalf of* the estate of Baby Boy Washington is not the appropriate question in determining whether an administrative claim is considered exhausted. In *Munger v. United States* and *Chang-Williams v. U.S.*, "exhaustion requires that the claim, but not necessarily the claimant or the theory of recovery, be presented to the agency." *See Chang-Williams*, 965 F.Supp.2d 673 at 699, (D. Md. 2013); *Munger*, 116 F.Supp.2d 672 at 676, (D. Md. 2000). The *Munger* Court held that, "this Court does not believe that it was ever Congress' intent to permit every nuance or permit technical varieties of the numerous states to undermine or frustrate the purpose of the notice requirement of 28 U.S.C. § 2675(a)." *Id*. Here, Mr. Washington satisfied the *Munger* Court's requirements by filing an administrative claim that put the Defendant on notice of a wrongful death administrative claim and a sum certain.

Essentially, the government's argument is basically that the words, "on behalf of my children" should have been *written*. If there ever was a technicality, this is it. Additionally, there

is no case law that the Defendant can point to that requires that at the time of the filing an administrative claim, Mr. Washington is required to be sworn in as the personal representative of his decedent son's estate. In fact, in the following case, the exact opposite was held.

In *Glover v. U.S.*, the decedents, Julianne Faith McCormack ("Julianne") and Jillian Angel McCormack ("Jillian") were children of the Plaintiffs Jeffrey A. McCormack and Jennie J. Glover. *See* 996 F.Supp.2d 372 at 374 (D. Md. 2014). Julianne was born March 30, 2010 and died twenty-three (23) days later as a result of complications incident to her premature birth. *Id*. Jillian was born on April 1, 2010 and died a short twenty-three (23) minutes later, also as a result of complications incident to her premature birth. *Id*. Ms. Glover, for herself and each of the twins, filed administrative claims with the Department of the Navy, which were denied. *Id*. In her federal lawsuit, Ms. Glover listed Jeffrey McCormack as a "use" plaintiff, although he did not join the action and was not on the administrative claim. *Id.* The United States filed a motion to dismiss Mr. McCormack as a plaintiff because he had not exhausted his administrative requirements and that the exhaustion requirement was jurisdictional. *Id*. The *Glover* Court held that, "[a]s prior cases in this Court establish, whether Mr. McCormack individually filed a claim is not outcome determinative as to whether the jurisdictional prerequisite of exhaustion is met." *Id.* at 377. "Whether his claim has been presented to the agency depends not on whether he was the individual to present it, but on whether the Government has adequate notice to conduct a proper investigation into the underlying incident and places a 'sum certain' on the claim's value" *Id*. (quoting *Chang-Williams v. United States*, 965 F.Supp.2d at 699, 2013 WL 4454597, at *23 (internal citations omitted)). The *Glover* Court held that, "the Department of the Navy was presented with his claims, even though he was not the individual to present them." *Id*. "Further, when read in conjunction with the Maryland Wrongful Death Act, Ms. Glover's administrative

claims afforded Defendant adequate notice as to Mr. McCormack's future inclusion in this lawsuit and the claims would be brought for his benefit." *Id*. Similarly, here, the Plaintiff has given the Department of the Navy notice of the Wrongful Death Claims. In following *Glover*, the North Carolina Wrongful Death Statute requires a personal representative or collector to bring the lawsuit. This statute, in conjunction with Mr. Washington's wrongful death administrative claim, is adequate notice to the Defendant that, when and if Mr. Washington's administrative claim on behalf of his deceased children is denied, then a personal representative or collector would be required and entitled to file suit in the appropriate District Court. *See* N.C. Gen. Stat. § 28A-18-2. *See e.g. Transco Leasing Corp v. U.S.*, 896 F.2d 1435, 1443-44 (5th Cir. 1990) (stating that, "although we find considerable merit in the government's argument that the burden of identifying qualified claimants should rest with the one presenting claims on another's behalf, and not with the government, we do not find that to be a sufficient basis upon which to bar these claims under the circumstances in this case"); *Van Fossen v. U.S.*, 430 F.Supp.1017 (N.D. Cal. 1977) (stating that, "any person who is intended to be the legal beneficiary of a wrongful death action under the substantive law of the place of the accident, is entitled to file an administrative claim . . . whether that claimant eventually may have to rely on an appointed representative to bring the action in the courts of that state is an irrelevant consideration at the administrative stage.").

      The Defendant has pointed to 28 C.F.R. §§ 14.2 and 14.3 as evidence that Mr. Washington's claims have not satisfied the administrative exhaustion requirement because, "Kenneth Washington was required to provide the requisite evidence of his authority to act on behalf of (Baby Boy) Washington." *See* Def.'s Mot. to Dismiss at 8. The Defendant goes on to argue, "[t]herefore, the 2010 claim cannot satisfy the jurisdictional requirement for

administrative claim presentment for anyone besides Kenneth Washington." *Id.* However, this argument fails for two reasons.

First, as had been identified above, the *Munger, Chang-Williams,* and *Glover* courts have consistently allowed administrative claims to be considered exhausted even if a representative is required under state law, so long as a sum-certain and notice is given. Second, and independently, under 28 C.F.R. § 14.3(c), "[a] claim based on death may be presented by the executor or administrator of the decedent's estate, *or by any other person legally entitled to assert such a claim in accordance with applicable State law.*" (emphasis added). Here, the applicable State law is North Carolina. In *Estate of Tallman ex rel. Tallman v. City of Gastonia,* the court held, "[a] personal representative may ratify and accept acts on behalf of the estate done by others where the acts would have been proper for a personal representative." 682 S.E.2d 428 (N.C. Ct. App. 2009). Therefore, under North Carolina State Law, Mr. Washington, as personal representative, is legally entitled to accept acts done on behalf of his decedent son's estate and therefore those administrative filings in 2010, by Mr. Washington, should be considered completed by a person legally entitled to assert such a claim in accordance with North Carolina law. *See* NC ST RCP § 1A-1 Rule 17(a), "No action shall be dismissed on the ground that it is not prosecuted in the name of the real party in interest until a reasonable amount of time has been allowed after objection for ratification of commencement of the action by, or joinder or substitution of, the real party in interest; and such ratification, joinder, or substitution shall have the same effect as if the action had been commenced in the name of the real party in interest."

Moreover, the cases cited by the Defendant are not controlling. For example, *Ahmed v. United States*, 30 F.3d 514, 516-17 (4th Cir. 1994), involved an SF95 with no sum certain and a lawyer (Mr. Thaw) filing a claim for a couple he did not represent. In fact, Mr. Thaw specifically

informed the Ahmeds that he did not represent them, but rather that he represented State Farm. *Id.* The *Ahmed* Court held that, "[t]he record before us contains no evidence that the Ahmeds ever gave Thaw authorization to represent them for their personal injury claims." *Id* at 517. Furthermore, the *Ahmed* Court held, "[t]he sum-certain requirement is one of substantial importance, and even courts liberally construing the presentment requirement under the FTCA require that the claimant place a certain value on the claim." *Id.* Here, we have a sum certain ($100,000,000) and a parent filing a claim on behalf of his children. Accordingly, the reasons applied by the *Ahmed* Court do not apply here. *Kokotis v. U.S. Postal Service*, 223 F.3d 275 (4th Cir. 2000) cited by the Defendant is also not on point because there was no sum-certain submitted before the statute of limitations ran. Specifically, this case deals with an administrative claim that contained no "sum certain." Here, we have a sum certain, and therefore the Defendant's argument regarding exhaustion must fail.

## II. <u>Plaintiff Has Met His Burden of Proving Subject Matter Jurisdiction With Regards to the Discretionary Function Exception.</u>

The Defendant could not *permissibly* decide to allow known contaminated water to reach its residents, however the Defendant seeks to ignore prior holdings of this Honorable Court and argue instead that this Court should follow the incorrect holdings of the *In Re Camp Lejeune* Court, which held that there was discretion with regard to allowing toxic water to be consumed by the residents of Camp Lejeune. *See* Def's Mot. to Dismiss at 12; *Jones v. U.S.*, 691 F.Supp.2d 639 at 643 (E.D.N.C. 2010) (holding that, "DCE, TCE, PCE, vinyl chloride and benzyne were regulated as 'toxic pollutants' under the Clean Water Act beginning in 1978" . . . as well as the Bureau of Medicine and Surgery ("BUMED") Instructions for Camp Lejeune, "mandate regular testing of the water supply, state that drinking water shall not contain impurities in concentrations which may be hazardous to the health of consumers."); *compared with In Re*

10
Case 7:19-cv-00112-BO   Document 33   Filed 01/20/20   Page 10 of 20

*Camp Lejeune North Carolina Water Contamination Litigation*, 263 F.Supp.3d 1318 (N.D. Ga. 2016). As will be shown below, there has been even more evidence discovered regarding the Defendant's knowledge and notice of the applicable toxins since the *Jones* Court found there to be no discretion with regard to the specific and mandatory instructions of the BUMEDs.

### A. The Argument for This Claim to Be Barred by the Discretionary Function Exception Has Been Rejected by This Honorable Court in *Jones v. U.S.*

In *Jones v. U.S*, the Plaintiff, Laura Jones, resided at Camp Lejeune from 1980-83 and consumed the base's contaminated water. *See* 691 F.Supp.2d 639 (E.D.N.C. 2010). The Plaintiff alleges that she was exposed to contaminants such as dichloroethylene ("DCE"), trichlorothylene ("TCE"), and tetrachloroethylene, also called perchloroethylene ("PCE"), vinyl chloride, and benzene in the water supply at Camp Lejeune. *Id* at 640. In *Jones v. U.S.*, this Court held that, "during at least part of the Plaintiff's residence at Camp Lejeune, the Department of the Navy had notice of the presence and toxicity of the chemicals at issue in the water supply of Camp Lejeune . . . and specific instructions were in place regarding the types of chemicals that Plaintiff alleges were responsible for her injuries." *Id*. at 643. The *Jones* Court held that the December 1972 Bureau of Medicine and Surgery ("BUMED") Instructions for Camp Lejeune, "mandate regular testing of the water supply, state that 'drinking water shall not contain impurities in concentrations which may be hazardous to the health of consumers,' and specifically limit acceptable levels of chlorinated hydrocarbons." *Id*. at 642.

The *Jones* Court went on to hold that, "DCE, TCE, PCE, vinyl chloride and benzyne were regulated as 'toxic pollutants' under the Clean Water Act beginning in 1978." *Id*. at 643. The Court further held that, "The EPA began regulating these chemicals under the Resource Conservation and Recovery Act in 1980." *Id*. Here, the Defendant should be held to the same

standard and beyond due to new information about the Defendant's knowledge and negligence coming to light. *See generally* Pl. Second Amend. Complaint (Dkt. 21).

Furthermore, Plaintiff would submit that there are three (3) separate and individual events that occurred that put, or should have put, the Defendant on notice of TCE, PCE, volatile organic compounds ("VOCs"), and Chlorinated Hydrocarbons in the water supply at Camp Lejeune. The first event was the Army Hygiene report of 1981, that stated "YOU NEED TO ANALYZE FOR CHLORINATED ORGANICS" and "WATER HIGHLY CONTAMINATED WITH OTHER CHLORINATED HYDROCARBONS (SOLVENTS!). *See* Pl. Second Amend. Comp. ¶ 61-64. These chlorinated organics that needed to be analyzed include tetrachloroethylene, trichloroethylene, dichloroethylene, and vinyl chloride. *Id*.

The second event was the early 1981 testing that was done at the Rifle Range on Camp Lejeune. *Id*. ¶ 65. The testing was done in March, April, and May of 1981 in response to concerns over a chemical dump. *Id*. Water was collected and sampled for various contaminants, including TCE and PCE. *Id*. The mere fact that the Defendant was conducting tests for TCE and PCE should be *prima facie* evidence that the Defendant was concerned about TCE and PCE levels. Confirming the Defendant's fears, the results were alarming, showing that water from the surrounding area of the chemical dump contained TCE and PCE. *Id.* The results from the water systems treated water and the untreated well also revealed VOCs. *Id*. These results were communicated to Naval Facilities Engineering Command, Atlantic Division (hereinafter "LANTDIV") officials, who in July 1981 informed Camp Lejeune officials. *Id*.

The third event was in October 1980, by Jennings Laboratories who was a contractor to the Navy engineers, had collected samples from each of the eight (8) water systems at Camp Lejeune, combined them into one composite sample, and tested it for a variety of chemical

contaminants. *Id*. ¶ 57. The results were then sent to LANTDIV headquartered in Norfolk, Virginia. *Id*. ¶ 58. These results showed trace levels of nearly a dozen potentially toxic compounds including trichloroethylene (TCE), tetrachloroethylene (or perchloroethylene, (PCE)), and dichloroethylene (DCE). *Id*. Knowing that these were composite samples and therefore water from each system had been diluted, this should have raised concerns, to a properly trained employee, as to whether one water system had a significant level of chemicals. *Id*. In other words, any properly trained employee looking at these results would have realized, or should have realized, the need for more testing. An utter and obvious failure to investigate the different samples goes directly against specific mandates contained in the BUMEDs.

### B. **Plaintiff Has Sufficiently Alleged a Violation of a Specific and Mandatory Provision in the Second Amended Complaint.**

Plaintiff's Second Amended Complaint sufficiently alleges a violation of a specific and mandatory provision under the first part of the discretionary function exception test. Here, the Plaintiff, has identified a multitude of failures to follow mandatory provisions on behalf of the Defendant. *See* Pl. Second Am. Compl. ¶ 48-85. As the Fourth Circuit has held, "[o]bviously, failure to perform a *mandatory* function is not a *discretionary* function. *Perkins v. U.S.*, 55 F.3d 910 at 914 (4th Cir. 1995). Here, the Defendant utterly failed to perform a mandatory function because the Defendant did not follow the specific, mandatory instructions required in the BUMEDs and Base Order and now are attempting to argue that this utter failure should be viewed as discretion.

The Defendant would like this Honorable Court to be persuaded that the they had no mandatory instructions with regards to both the organic solvents and chlorinated hydrocarbons that were discovered in the water from the U.S. Army Environmental Hygiene Agency, the TCE and PCE found in the water from Jennings Laboratories in 1980, and the TCE, PCE and VOCs

found at the Rifle Range in 1981. *See* Pl. Second Am. Compl. ¶ 57-58, 60-65. The Defendant points to the *In re Camp Lejeune* holding that, "the BUMEDs did not require any action regarding the chemicals at issue until 1993." *See* Def.'s Mot. to Dismiss at 13. However, just as the *Jones* Court correctly reasoned, this holding is flawed in that the *In re Camp Lejeune* Court ignores section 7(a)(3)(d) of BUMED that states, in part:

> Substances which may have harmful physiological effects or for which physiological effects are not known, shall not be introduced into the system in a manner which would permit them to reach the consumer.

The Defendant, in their MTD, and the *In Re Camp Lejeune* Court never resolve the issue of how there could possibly be discretion when the BUMEDs even account for substances in which "physiological effects are not known." *Id*. The Defendant knew that that the water, on multiple tests and occasions, as argued above, showed signs of TCE, PCE, VOCs, chlorinated organics, and chlorinated hydrocarbons, and instead of following the BUMEDs to conduct further testing and to not permit these contaminates to reach residents, the Defendant did nothing. *See also Swafford v. United States*, 839 F.3d 1365, 1372 (11th Cir. 2016) ("the Corp's contract with Anderson specifically required Anderson to inspect, maintain, and repair the Campground's stairways as 'necessary to keep them in safe working condition' . . . Whatever range of choice the Corps may have had in supervising Anderson, 'choosing' to 'accept' a dangerously unsafe stairway is simply not a permissible exercise of discretion any more than choosing to not maintain a lighthouse.").

Furthermore, the *In Re Camp Lejeune* holding did not have before it the new evidence of the Defendant's knowledge, as previously stated. In fact, the Defendant, when presented with evidence of both PCE and TCE at Willow Grove Naval Air Station in Pennsylvania in 1979, took a different approach. *See* Camp Lejeune: Contamination and Compensation, Looking Back,

Moving Forward, 111th Cong. 108 (2010). At Willow Grove Naval Air Station, the contaminated wells producing PCE and TCE in the base's drinking water were identified and closed. *Id.; see also* Public Health Assessments for Willow Grove NAS and Warminster Naval Air Warfare Center, The Agency for Toxic Substances and Disease Registry, 2002. How can the Defendant close a well in 1979 for having TCE and PCE and then argue, in 1981, that they didn't know whether TCE and PCE have harmful physiological effects, or at the very least unknown physiological effects? Moreover, even further back, in 1977, the water at Pease Air Force Base in New Hampshire was analyzed and found to contain TCE. *See* Public Health Assessments for Pease Air Force Base, The Agency for Toxic Disease Registry, 1999. The contaminated wells were then shut off and water was provided to the base by the City of Portsmouth. *Id*. Knowing that the Defendant acted in this manner with regards to PCE and TCE on military bases in 1977 and 1979, how can the Defendant argue that their actions did not violate the mandatory provisions of the BUMEDs? Clearly their actions did.

The Defendant attempts to introduce a timeline deficiency in the Plaintiff's Complaint by arguing that, "Thus, the injury of which Kenneth Washington complains in his Second Amended Complaint was before the letter to the Commanding General in August 1982, which shows that even if the BUMEDs applied to the chemicals at issue in this case, the Commanding General had not been informed of the contamination prior to the injuries alleged in Plaintiff's Second Amended Complaint, and the rationale in *Jones* would thus not apply to save Plaintiff's Second Amended Complaint." *See* Def.'s Mot. to Dismiss at 14. However, this attempt fails for two reasons. First, the Plaintiff's Second Amended Complaint states, "testing at the Rifle Range, in response to a chemical dump, revealed volatile organic compounds ("VOC"), including TCE and PCE, in the water in areas surrounding the chemical dump, as well as VOCs in the treated

water." Pl. Second Am. Compl. ¶ 65. In July of 1981, the Atlantic Division of the Naval Facilities Engineering Command ("LANTDIV") communicated this information to Camp Lejeune officials. *Id*. Additionally, the Plaintiff's Second Amended Complaint alleges testing done by Jennings Laboratories in October of 1980 that showed trace levels of TCE, PCE and DCE, knowing that those levels were diluted and requested further testing. *Id*. ¶ 58. This dilution should have been readily apparent to a trained chemist. Multiple well water samples were combined and tested together. Since there were trace levels of TCE, PCE and DCE, the wells should have been tested individually, but they were not. The Defendant could not *permissibly* decide to fail to treat the contaminated water to remove the solvents and contaminants before knowingly piping the water to its residents. With this information, the Plaintiff has alleged facts that were not available to the *Jones* Court that would put Camp Lejeune officials on notice earlier. Therefore, it would hold, that if the *Jones* Court determined that the Defendant had notice of the presence and toxicity of the chemicals at Camp Lejeune, then the allegations in the Plaintiff's Second Amended Complaint would only serve to augment the timeframe of that notice.

Second, the Defendant argues that the "Commanding General had not been informed of the contamination" as if the Commanding General of Camp Lejeune was the only applicable person when determining knowledge. Def.'s Mot. to Dismiss at 14. This is not the case. As alleged in the Plaintiff's Second Amended Complaint, the knowledge of the toxins from base personnel as well as officials from LANTDIV[3] went up and down the chain of command. *See* Pl.

---

[3] LANTDIV, also known as Navy Facilities Engineering Command, Atlantic Division (NAVFAC), "manages the planning, design, construction, contingency engineering, real estate, environmental and public works support for U.S. Navy shore facilities around the world." *See* https://www.navfac.navy.mil/navfac_worldwide/atlantic/about_us.html (last visited January 13, 2020). Therefore, if LANTDIV was aware of water contamination then the Defendant had knowledge of the contamination.

Second Am. Compl. ¶¶ 60-70. Therefore, because of LANTDIV knowledge, as well as Camp Lejeune officials' knowledge, the Defendant had absolute knowledge of this issue during the relevant time period of the Plaintiff's injuries.

### C. Plaintiff Has Shown that Defendant's Conduct is not Based on Policy Decisions.

The Court need not go to this step of the analysis because the Defendant had no discretion to not follow the specific, mandatory requirements of the BUMEDs and Base Order as argued. However, even if there was discretion in the BUMEDs and Base Orders, this discretion was not susceptible to policy analysis.

The Defendant attempts to persuade this Honorable Court that, "given the important national security policies underlying the missions of the military at Camp Lejeune, there is a strong presumption that military policy considerations underlie government operations and operational decisions on base at Camp Lejeune." Def.'s Mot. to Dismiss at 18. However, the Defendant cannot articulate any rational policy choice consistent with the directive of the regulation at issue, and concomitantly, they instead fall back on absurdly distant policy considerations – the mission of the Marine Corps, and the like.

The Defendant's argument on policy susceptibility comes down to this: Is it allowed, under the rule of law, for the Defendant to know that water was contaminated and supply it to the residents of Camp Lejeune anyway? The Defendant would like this Court to answer in the affirmative and points this Court to Department of Navy regulations, mission statements, and national security concerns. *Id*. Giving the Defendant the utmost benefit under the law, knowing that troops need to be ready to defend the nation, it could be argued that providing contaminated water to Marines and other servicemembers was a policy consideration that underlies government operations and operational decisions on base at Camp Lejeune. The same, however,

cannot be said about providing contaminated water to civilians, let alone pregnant civilians. Why not provide pregnant women and civilians with off base housing or restrict Camp Lejeune to essential personnel only? There could be no policy consideration that would allow for providing pregnant civilians with contaminated water, to include drinking water.

The Defendant's cites *Aragon v. United States*, in which that court held that the military's use and disposal of chemicals, "involved policy choices of the most basic kind." *Id.* at 16-17. This case is separate and distinct for two reasons, the first is that the Air Force did not have a resident population to provide clean water to that was at issue, and the second is the Court only looked toward the disposal of the waste water and not providing it to a population. Additionally, in *Aragon*, Executive Order 10014 was issued that informed the Air Force to take action in disposing of water, "as may be practical." *See Aragon v. United States*, 146 F.3d 819 at 824 (10th Cir. 1998). It follows then that there was discretion in the *disposal* of chemicals, considering there was not a lawsuit from residents of the base that drank the water, unlike the instant case before this Honorable Court where there was no discretion.

In *U.S. v. Gaubert*, the Court held that, "[f]or a complaint to survive a motion to dismiss, it must allege facts which would support a finding that the challenged actions are not the kind of conduct that can be said to be grounded in the policy of the regulatory regime." 499 U.S. 315, 324-25 (1991). Here, the Plaintiff has satisfied these criteria and it is not only telling, but also dispositive, that the Defendant cannot articulate any rational policy choice consistent with the directive of the regulation at issue.

## CONCLUSION

For all the foregoing reasons, the Defendant's Motion to Dismiss for Lack of Subject-Matter Jurisdiction must be denied.

Dated: January 20, 2020                     Respectfully Submitted,


                                            CHRISTOPHER E. SAWIN*
                                            SAWIN LAW, P.C.

                                            /s/ Anthony J. Poulos_____
                                            Anthony J. Poulos (BBO# 698943)*
                                            Argos Legal Group, P.C.
                                            1 Beacon Street, Suite 1500
                                            Boston, MA 02108
                                            617-212-7458
                                            apoulos@argoslegalgroup.com


                                            /s/ Inez de Ondarza Simmons_____
                                            Inez de Ondarza Simmons
                                            North Carolina State Bar No. 34303
                                            DE ONDARZA SIMMONS PLLC
                                            N. Boylan Ave, Suite 135
                                            Raleigh, North Carolina 27603
                                            Telephone: (919) 256-3736
                                            Fax: (919 277-7120
                                            Email: Inez@DeOndarzaSimmons.com

                                            *Appearing by special appearance pursuant to Local
                                            Rule 83.1(d)

                                            Counsel For Kenneth Washington

## CERTIFICATE OF SERVICE

I hereby certify that on January 20, 2020 the foregoing has been served via the Court's ECF system on the Defendant's counsel of record.

/s/ Anthony J. Poulos
Anthony J. Poulos (BBO# 698943)
Argos Legal Group, P.C.
1 Beacon Street, Suite 1500
Boston, MA 02108
617-212-7458
apoulos@argoslegalgroup.com


/s/ Inez de Ondarza Simmons
Inez de Ondarza Simmons
North Carolina State Bar No. 34303
DE ONDARZA SIMMONS PLLC
N. Boylan Ave, Suite 135
Raleigh, North Carolina 27603
Telephone: (919) 256-3736
Fax: (919 277-7120
Email: Inez@DeOndarzaSimmons.com


*Appearing by special appearance pursuant to Local Rule 83.1(d)