IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
No. 7:19-cv-112-BO

| | |
|---|---|
| KENNETH WASHINGTON | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   O R D E R |
| | ) |
| DEPARTMENT OF THE NAVY, | ) |
| | ) |
| Defendant. | ) |

This matter is before the Court on defendant's motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1). DE 31. For the reasons discussed below, defendant's motion is DENIED.

## BACKGROUND

Plaintiff, Kenneth Washington, served in the United States Marine Corps from November 1978 to January 1984. Pl.'s Second Am. Comp. ¶ 10, DE 21. From 1979 to 1981, and again from 1983 to 1984, plaintiff was stationed at Camp Lejeune in Jacksonville, North Carolina with his wife, Rhonda Bell. *Id.* ¶¶ 11–12. While living there, he and his wife used the facility's water supply for drinking, cooking, and hygiene. *Id.* ¶ 13.

In September 1980 and March 1981, Bell had two miscarriages. *Id.* ¶ 14. In February 1982, Bell gave birth to a baby boy (hereinafter "Baby Boy Washington" or "decedent") who lived for 32 minutes. *Id.* ¶ 18. The cause of death was listed as prematurity due to severe preeclampsia. *Id.*

In 2008, plaintiff received a letter from the United States Navy. *Id.* ¶ 22. The letter informed him that the water supply at Camp Lejeune had been contaminated when he lived there.

*Id.* Despite having left the Marine Corps decades earlier, this was the first-time plaintiff was given notice of the Camp Lejeune water crisis, and plaintiff had no prior knowledge of the contamination. *Id.* ¶¶ 23–24.

Either the next day or that week, plaintiff called the Department of the Navy and spoke with someone who informed him of his right to file a wrongful death claim and sent him a form to complete. *Id.* ¶¶ 25–28. Plaintiff filled out the form—which he believes to either have been a wrongful death form or a Standard Form 95—and sent it to back to the Navy. *Id.* ¶¶ 29–31. Over the course of the next year, plaintiff was repeatedly told that his claim was being processed and would take six weeks to eighteen months. ¶ 32. Eventually, in late 2009 or early 2010, the Navy informed him that his claim was lost. *Id.* ¶¶ 32–34. On March 19, 2010, plaintiff went to the Kokomo, Indiana VA building and filed a Standard Form 95. *Id.* ¶ 35. On the form, plaintiff alleged the wrongful death of his children, explaining that he and his wife were exposed to Trichlorethylene (TCE) and Tetrachloroethylene (PCE) from the water at Camp Lejeune. *Id.* ¶ 39. The form was stamped "received May 2010" by the Navy and plaintiff received a separate letter acknowledging receipt. *Id.* ¶ 36–37.

Nine years later, in January 2019, plaintiff received a letter from the Navy informing him that his claim was considered and did not meet the requirements for compensation under the FTCA. *Id.* ¶ 43.

Plaintiff filed this lawsuit on behalf of his deceased son, Baby Boy Washington, in June 2019. Plaintiff sued under the Federal Tort Claims Act (FTCA) for wrongful death and intentional infliction of emotion distress. Plaintiff alleges that defendant breached its duty of care by: (1) causing or allowing dangerous pollutants and contaminants to exist in the water supply at Camp Lejeune; (2) failing to provide an uncontaminated water supply; (3) failing to conduct

various due diligence with respect to monitoring the water supply; (4) failing to heed early warnings about the contamination; and (5) withholding information about the contamination crisis. *Id.* ¶¶ 55, 86–101.

Plaintiff alleges that there were numerous events and warning signs that put defendant on notice that hazardous chemicals contaminated the water at Camp Lejeune. In 1980, tests of each of the eight water systems at Camp Lejeune showed trace levels of nearly a dozen potentially toxic compounds, including TCE and PCE. *Id.* ¶¶ 57–58. In October 1980, the Navy tasked the laboratory of the U.S. Army Environmental Hygiene Agency to sample and test the water. *Id.* ¶ 60. The report from the tests concluded: "water is highly contaminated with low molecular weight halo-generated hydrocarbons." *Id.* ¶ 61, Ex. E. Follow-up tests were conducted in early 1981. *Id.* ¶ 62. The report from these tests concluded: "you need to analyze for chlorinated organics." *Id.*, Ex. F. The chlorinated organics that required analysis included tetrachloroethylene, trichloroethylene, dichloroethylene, and vinyl chloride. *Id.* In the report on further follow up tests, the chief of laboratory services offered a final warning: "Water is highly contaminated with other chlorinated hydrocarbons (solvents)!" *Id.* ¶ 64, Ex. G (emphasis in original). In early 1981, additional testing occurred at the rifle range. *Id.* ¶ 65. The samples, taken from the water system's treated and untreated water, contained volatile organic compounds, including TCE and PCE. *Id.* ¶ 65.

On July 3, 2019, the United States moved to transfer the case to the Northern District of Georgia, where other cases relating to water contamination at Camp Lejeune had been previously consolidated. In the interim, plaintiff filed an amended complaint in August 2019. On September 10, 2019, defendant moved to dismiss for lack of subject-matter jurisdiction. On September 30, 2019, plaintiff moved for leave to file a second amended complaint. On October

3

2, 2019, the Panel on Multidistrict Litigation denied the transfer motion. The Court granted plaintiff's motion to amend his complaint.

Defendant now moves to dismiss plaintiff's second amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject-matter jurisdiction. Defendant makes two arguments for why this Court lacks jurisdiction. First, defendant argues plaintiff failed to exhaust his administrative remedies under the FTCA for a wrongful death claim on behalf of Baby Boy Washington. Second, defendant argues that the basis for plaintiff's wrongful death claim—the contamination of the drinking water at Camp Lejeune—falls within the FTCA's discretionary function exception.

## DISCUSSION

The FTCA waives sovereign immunity for claims against the United States based on the torts of federal employees committed within the scope of their employment. 28 U.S.C. §§ 1346(b)(1), 2671–2680. Before a plaintiff may bring suit under the FTCA, he must first exhaust his administrative remedies by presenting his claim to the appropriate federal agency. § 2675(a). In addition, the FTCA's waiver of immunity does not extend to claims based upon the performance of a discretionary function or duty. § 2680(a). These features of the FTCA implicate the Court's subject-matter jurisdiction and cannot be waived. *Williams v. United States*, 50 F.3d 299, 305 (4th Cir. 1995) (holding that there is no subject-matter jurisdiction when the discretionary function exception applies); *Henderson v. United States*, 785 F.2d 121, 123 (4th Cir. 1986) ("It is well-settled that the requirement of filing an administrative claim is jurisdictional and may not be waived.").

Defendant appears not to dispute the allegations in the complaint but contends that even if all the alleged facts are true, the complaint fails to establish jurisdiction. *Rich v. United States*,

811 F.3d 140, 144–45 (4th Cir. 2015). "Generally, when a defendant challenges subject matter jurisdiction via a Rule 12(b)(1) motion to dismiss, the district court may regard the pleadings as mere evidence on the issue and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Velasco v. Gov't of Indonesia*, 370 F.3d 392, 398 (4th Cir. 2004).

I. Plaintiff's Administrative Claim

An FTCA plaintiff must first present his administrative claim to the appropriate federal agency. Presentation has been "interpreted by the courts to indicate that the claimant meets his burden if the notice is (1) sufficient to enable the agency to investigate and (2) places a sum certain value on her claim." *Ahmed v. United States*, 30 F.3d 514, 516–17 (4th Cir. 1994) (internal quotations omitted). FTCA implementing regulations clarify how a claim is properly "presented." *See id.* (citing 28 C.F.R. § 14.2(a)). In *Ahmed*, the Fourth Circuit summarized the requirements for presenting an administrative claim, including that "if the claimant is represented, the representative's authorization must be demonstrated[.]" 30 F.3d at 517. Moreover, the regulations state that "[a] claim based on death may be presented by the executor or administrator of the decedent's estate, or by any other person legally entitled to assert such a claim in accordance with applicable State law." 28 C.F.R. § 14.3(c).

As stated above, plaintiff filed at least one, perhaps even two—one of which defendant lost—Standard Form 95s with the Navy. DE 32-1. On the form, plaintiff explained that the basis of his claim was the two miscarriages and death of Baby Boy Washington. The amount claimed is not associated with "property damage" or "personal injury" but is clearly identified as for "wrongful death." The form itself is clear evidence that he filed on behalf of Baby Boy Washington. Based on this Standard Form 95, the Court finds that defendant had sufficient

5

notice to investigate the claim; and the Court holds that plaintiff properly presented his administrative claim under the FTCA.

Defendant contends that plaintiff did not present his claim because he did not explicitly state on the form that his wrongful death claim was "on behalf of" Baby Boy Washington. Defendant goes as far as arguing the claim "does not in any way represent that Kenneth Washington sought damages on behalf of any other person." Def. Resp. at 7, DE 32.

The Court disagrees. Any reasonable person reading plaintiff's Standard Form 95 would know the exact nature, purpose, and amount of the claim. There is no plausible argument that plaintiff was claiming damages for anything other than the wrongful death of his children. Indeed, the defining feature of a wrongful death claim is that it is on behalf of someone else. One cannot, by definition, bring a wrongful death claim for himself. "The FTCA was not intended as a trap for the unwary claimant, and the purpose of 28 U.S.C. § 2675(a) is to provide notice to the relevant federal agency of claims, not to put up a barrier of technicalities to defeat their claims." *Starr v. United States*, 262 F. Supp. 2d 605, 607–08 (D. Md. 2003); *see also Santiago-Ramirez v. Sec'y of Dep't of Defense*, 984 F.2d 16, 19 (1st Cir. 1993) (explaining that individuals wishing to sue the government must comply with the FTCA's details, "but also keeping in mind that the law was not intended to put up a barrier of technicalities to defeat their claims").

Defendant also argues that plaintiff's claim was not presented to the Navy because plaintiff was not officially approved as administrator of decedent's estate until September 2019.

This argument also fails. A claim based on death may be presented by any person legally entitled to assert such a claim under state law. 28 C.F.R. § 14.3(c). In North Carolina, "[a] personal representative may ratify and accept acts on behalf of the estate done by others where the acts would have been proper for a personal representative." *Estate of Tallman ex rel. Tallman*

6

*v. City of Gastonia*, 200 N.C. App. 13, 19 (2009). Here, it was clearly proper for the father of Baby Boy Washington to file an FTCA administrative claim on the baby's behalf and his official appointment as personal representative relates back, consistent with North Carolina law and § 14.3(c).

*Ahmed v. United States*, 30 F.3d 514 (4th Cir. 1994), the case on which defendant primarily relies to argue that plaintiff did not present his claim, does not control this case. In that case, the plaintiffs attempted to sidestep the FTCA's exhaustion requirement for their personal injury claim resulting from a car accident. 30 F.3d at 517–18. The plaintiffs argued that the administrative claim filed by their car insurance company's lawyer as part of his representation of the company's subrogation claim for damage to the vehicle satisfied the FTCA's presentation requirement. *Id.* They also filed their lawsuit after the FTCA's statute of limitations expired and no personal injury claim was listed in any administrative claim. *See id.* 515–18. Here, plaintiff presented his wrongful death claim on time, demanded a sum certain, and demonstrated his authority to bring the claim. In short, he has satisfied the FTCA's presentation requirement.

II. Discretionary Function Exception

Defendant's second argument for dismissal is that the contamination of drinking water at Camp Lejeune, and the government's conduct with respect to investigation and remediation, were "discretionary functions" under 28 U.S.C. § 2680(a). "Government conduct is protected by the discretionary function exception if it involves an element of judgment or choice, and implicates considerations of public policy." *Seaside Farm, Inc. v. United States*, 842 F.3d 853, 858 (4th Cir. 2016) (quoting *Berkovitz v. United States*, 486 U.S. 531 (1988)) (internal quotations omitted). In applying the FTCA's discretionary function exception, a court must first determine "whether any federal statute, regulation, or policy specifically prescribes a course of

action." *Id.* If not, a court must then consider whether the government's conduct "is of the kind that the discretionary function exception was designed to shield." *Berkovitz*, 486 U.S. at 536. This inquiry focuses on the "nature of the actions taken and . . . whether they are susceptible to policy analysis." *Seaside Farm*, 842 F.3d at 858 (quoting *United States v. Gaubert*, 499 U.S. 315 (1991)).

The Court finds that on either step of the analysis, plaintiff's claims fall outside of the discretionary function exception.

a. Specific and mandatory government conduct.

In his allegations that defendant breached its duty of care, plaintiff alleges a sequence of neglectful conduct. Plaintiff alleges defendant caused or allowed various hazardous chemicals to exist in the water supply, failed to properly monitor the water supply, failed to heed early warning signs of contamination, failed to warn residents of the problem, and finally, withheld information about the crisis. The Court only addresses the first of these because it concludes, right off the bat, that a sufficiently specific provision governed defendant's conduct with respect to permitting hazardous chemicals to exist in the water supply.

"It is elementary that the discretionary function exception does not immunize the government from liability for actions proscribed by federal statute or regulation." *Limone v. United States*, 579 F.3d 79, 101 (1st Cir. 2009). In this case, defendant transgressed a clear, specific prohibition. At all relevant times, defendant was bound by Department of Navy, Bureau of Medicine and Surgery Instruction (hereinafter "BUMED") 6240.3(b) or BUMED 6240.3(c), which set standards for drinking water across the Naval establishment. Both BUMEDs carry unambiguous proscriptions with respect to the chemical composition of water: "[s]ubstances which may have deleterious physiological effects, or for which physiological effects are not

8

known, shall not be introduced into the system in a manner which would permit them to reach the consumer." Pl.'s Comp., Ex. B § 7(c), Ex. C § 7(d). The BUMEDs also state: "[d]rinking water shall not contain impurities in concentrations which may be hazardous to the health of consumers." *Id.*

The BUMEDs proscribe a specific course of conduct—namely, introducing harmful contaminants into the water supply. This prohibition does not distinguish between chemicals intentionally or negligently introduced. Indeed, the prohibition specifically accounts for substances for which the physiological effects are unknown. This indicates that it was meant to proscribe any conduct that would cause the introduction of harmful chemicals into the water supply in a manner which would permit them to reach the consumer. As alleged in the complaint, defendant transgressed this prohibition by causing or permitting harmful chemicals to exist in the Camp Lejeune water supply.

In arguing for the discretionary function exception, defendant attaches great weight to the fact that the chemicals TCE and PCE were not specifically identified in the BUMEDs or another directive. Def. Mot. at 12–14, DE 32. Because TCE and PCE were not enumerated in a regulation or directive, with a maximum allowable amount established, defendant contends that it had no obligation to do anything to manage or prevent TCE and PCE from poisoning the water. *Id.*

This argument is unavailing. The relevant question is not whether there were specific directives that identified TCE and PCE or whether those responsible for water at Camp Lejeune had discretion in how they achieved a clean water supply.[1] The proper question is whether there

---

[1] The Court recognizes that prior cases have addressed this issue. A recent decision by this Court, *Tate v. Camp Lejeune*, 2019 WL 7373699 (E.D.N.C. Dec. 30, 2019), concluded the discretionary function exception applied to the water contamination at Camp Lejeune. *Tate,*

9

existed a "matter of choice" for defendant. *Berkovitz*, 486 U.S. at 536. With respect to the BUMED's prohibition on permitting hazardous chemicals, known and unknown, to enter the water supply, there was no such choice.

The BUMED's mandatory prohibition in this case sets it apart from the groundwater contamination arising from the Army's waste management practices connected to biological weapons development at Fort Detrick, at issue in *Pieper v. United States*, 713 F. App'x 137 (4th Cir. 2017) (affirming the district court on its reasoning and summarizing with approval *Waverley View Inv'rs, LLC v. United States*, 79 F. Supp. 3d 563 (D. Md. 2015)). In that case, the plaintiff attempted to rely on an Executive Order and regulations which created affirmative duties

---

however, involved a short, hand-written complaint by a *pro se* plaintiff, who also failed to respond to defendant's motion to dismiss. In this case, plaintiff's complaint has detailed factual allegations, including the BUMEDs, that were not available to the Court in *Tate*.

A separate district court, in an MDL with seventeen cases, also determined that the discretionary function exception applied. *See In re Camp Lejeune N. Carolina Water Contamination Litig.*, 263 F. Supp. 3d 1318 (N.D. Ga. 2016). The MDL court analyzed EPA regulations implementing the Safe Drinking Water Act of 1974, Base Order 5100.13B, and the same BUMEDs at issue in this case. *Id.* at 1348–52. Regarding the BUMEDs, the MDL court explained that "[t]he fact that BUMEDs were orders that had to be followed . . . does not mean that the BUMEDs contained specific mandatory instructions for how to achieve a clean water supply that removed any discretion . . . ." *Id.* at 1350–51. The court continued its analysis, focusing closely on whether there were specific instructions concerning TCE and PCE. *Id.* at 1351–52. Ultimately, the court found that there was no mandatory regulation on the relevant chemicals until after the wells at Camp Lejeune were closed. *Id.* at 1352. This finding, along with the fact that defendant had discretion for achieving a clean water supply, led to the court's determination that there was no regulation that mandated specific government performance. On appeal, the Eleventh Circuit determined that North Carolina's statute of repose barred the plaintiffs' claims and affirmed the MDL court without considering the discretionary function exception.

Plaintiff in this case was not a party to the MDL and the Court is not bound by the MDL court's ruling. The Court has thoroughly considered the MDL court's analysis but declines to adopt it here. It is this Court's determination that there was a mandatory proscription in effect at Camp Lejeune to not introduce harmful chemicals into the water supply and, therefore, the discretionary function exception is inapplicable.

10

"pitched at a high level of generality." *Id.* at 140. The supposedly mandatory language was also written flexibly and with qualifications. *See Pieper v. United States*, 2016 WL 4240086, at *4–5 (D. Md. Aug. 11, 2016).

In contrast, the BUMED's flexible language is well demarcated in other sections of the document that are dedicated to setting general goals and considerations for developing a clean water supply. For example, BUMED 6240.3(c) § 6, entitled "Source and Protection," established broad principles for achieving a water supply that satisfied the quality standard set forth in § 4. These broad principles include that "[t]he water supply should be obtained from the most desirable source which is feasible" and "[a]pproval of water supplies shall be dependent upon . . . proper operation of the water supply system . . . ." BUMED 6240.3(c) could have stopped there. It could have adopted a general standard of water quality in § 4, and then gone on to state some basic principles for achieving that standard in a cost-effective manner. But the instruction did not stop there. It added a seventh section detailing mandatory bacterial standards, physical characteristics, and chemical characteristics. BUMED 6240.3(c) § 7(a)–(d). Within chemical characteristics, the BUMED explicitly instructs: "[s]ubstances which may have deleterious physiological effect, or for which physiological effects are unknown, shall not be introduced in a manner which would permit them to reach the consumer." Tellingly, the subsection on chemical characteristics is the only one with such a proscriptive command. This command cannot be read out of the BUMED.

Finally, the BUMED's proscription was sufficiently specific because it told government actors precisely what was prohibited—introducing toxic chemicals into the water. In the context of proscriptive commands, a requirement for further specificity would place an insurmountable burden on plaintiffs because it would require plaintiffs to show that the government had

11

mandatory instructions about how to *not* do something. Such instructions are unlikely, if ever, to exist. The instruction here is sufficiently specific.

    b. Susceptibility to policy analysis

Even if the BUMEDs did not exist, plaintiff's claims would not fall within the discretionary function exception because the challenged government action is not "the kind that the discretionary function exception was designed to shield." *Berkovitz*, 486 U.S. at 536. This inquiry looks to whether the government's conduct is susceptible to policy analysis. *Seaside Farm*, 842 F.3d at 858. The purpose of this step in the discretionary function analysis is to prevent second-guessing of government actions based on policy, understanding that government actors must weigh various policy considerations and make judgments. *See Berkovitz.* at 536–37, *and Seaside Farm*, 842 F.3d at 860.

However, in *Rich*, the Fourth Circuit embraced the idea that in cases of government inattention and carelessness, no policy considerations are implicated, and thus, the discretionary function exception does not apply. 811 F.3d at 147 (citing *Coulthurst v. United States*, 214 F.3d 106 (2d Cir. 2000)). The Court finds that this is one of those cases.

Plaintiff's complaint challenges a sequence of governmental inattention and recklessness with respect to the water supply at Camp Lejeune. Plaintiff contends defendant first allowed contaminants into the water, then supplied that water to Camp Lejeune residents, then failed to properly monitor the water, then failed to heed early warning signs of the problem, then failed to warn residents of the contamination, and finally, withheld information about the problem. Plaintiff's challenge is not a challenge to an affirmative chemical waste disposal decision by the government, like was at issue in *Pieper*. Rather, plaintiff challenges a decades-long failure by defendant, after contaminating the water supply at Camp Lejeune, to take any steps to protect

12

and warn servicemembers and their families. There are simply no policy considerations to balance or weigh in defendant's failure to provide uncontaminated water at Camp Lejeune over a period of several decades.

This sequence of neglect is different in kind from the premises liability argument in *Wood v. United States*, 845 F.3d 123 (4th Cir. 2017), where a civilian law enforcement officer argued that the Navy negligently maintained landing mats at a training facility which the Navy had permitted local law enforcement to use for training exercises. As part of the training exercise, the plaintiff jumped onto mats from two stories high. *Id.* at 126. When she landed, two mats separated and she fell through the gap onto the ground, suffering disabling injuries. In its discretionary function analysis, the court determined that "the Navy's first-order decision of whether to allow civilian use of its bases at all is shielded by the discretionary function exception." *Id.* at 130. And in further examining the Navy's program to allow civilian use of its facilities, the court explained that the various guidance documents gave officers discretion to implement a civilian-use program at the lowest cost possible. Here, the proscription of the BUMEDs was to not introduce toxins into the water. The proscription is not qualified for other factors such as cost. In any case, a single instance of negligence with respect to the permissive use of a training facility is of a wholly different nature than what is at issue here. Plaintiff's allegations of decades-long neglect do not involve policy considerations. *See Rich*, 811 F.3d at 147.

Defendant invokes ill-defined national security policy considerations. Pointing to the statutory charges of the Navy and Marine Corps to develop and provide forces to effectively prosecute military campaigns, defendant argues the provision of water, disposal of chemicals, and "prioritization of limited financial resources" are all relevant national security considerations

13

that underlie the military's mission. Def. Mot. at 16, 18, DE 32. Through its argument, defendant attempts to recast plaintiff's complaint as challenging hard national security choices made in the face of resource constraints. But that is not what plaintiff challenges.

"[N]ational-security concerns must not become a talisman used to ward off inconvenient claims—a label used to cover a multitude of sins." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1862 (2017) (internal quotations omitted). Defendant's neglectfulness challenged here—the provision of contaminated water at a military installation within the United States over a period of decades, a failure to perform due diligence, and a failure warn and protect residents—is not susceptible to policy analysis and is not the type of conduct the discretionary function exception was designed to shield.

The Court holds that plaintiff's claims fall outside of the FTCA's discretionary function exception and that the Court has subject-matter jurisdiction over plaintiff's case.

## CONCLUSION

For the forgoing reasons, defendant's motion to dismiss [DE 31] is DENIED.

SO ORDERED, this the ___17___ day of March, 2020.

*Terrence Boyle*

TERRENCE W. BOYLE
CHIEF UNITED STATES DISTRICT JUDGE